# Lacey *v.* The State.

*Embezzlement.*

(Decided February 11, 1915.   Rehearing denied April 6, 1915.
68 South. 706.)

*Embezzlement; Officer; Statute.*—The clerks in the convict department appointed by virtue of section 6485, Code 1907, are officers of the state within section 6838, Code 1907, as amended by Acts 1907, p. 162, ·punishing embezzlement by public officers.

APPEAL from Montgomery City Court.

Heard before Hon. ARMSTEAD BROWN.

Theo Lacy, alias, was convicted of embezzlement, and he appeals. Affirmed.

(This case was reviewed by the Supreme Court on certiorari to the Court of Appeals, and the writ was denied. See 193 Ala. 677, 69 South. 1018.—Reporter.)

James G. Oakley was appointed as president of the board of convict inspectors of the state in March, 1911, and on or about the same date the appellant, Lacy, was appointed, in the method required by the statute, to one of the offices provided for by section 6485 of the Code, viz., clerk of the convict department, and was known as the chief clerk of the department. The convict department was constantly receiving large sums of money arising from the hire of convicts and other sources, paid usually, if not always, in the form or by way of checks, drafts, or bills of exchange. Under the custom prevailing in the department, Lacy took charge of these checks and deposited them in bank. Prior to the 8th day of March, 1913, an account had been carried at the Montgomery Savings Bank, in the name of J. G. Oakley, President, to the credit of which account

had been deposited a number of checks received by the convict department in payment of sums due by various parties. Upon this account Oakley, as president, had drawn several checks, each payable to the order of the treasurer of the state, the proceeds of which had gone into the treasury. There remained to the credit of that account on March 8th about $40,000. On March 8, 1913, Lacy deposited in that bank to the credit of that account various checks, drawn in payment of sums due the convict department, aggregating something over $100,000, stating at the time to the officials of the bank that he would desire to withdraw about the 11th of March, in cash, the entire amount to the credit of the above stated account.

Harold, the president of the bank, being advised of this statement, called on Oakley with reference to this statement of Lacy's and was told by Oakley that Lacy was correct, and that it would be desired by the convict department to withdraw the entire amount in cash. He further stated that, since Harold was uncertain whether the entire amount could be collected in that time, and therefore uncertain whether he would be able to deliver the entire amount standing to the credit of the account in cash, Lacy would present a check, signed by Oakley, drawn on the Montgomery Savings Bank and against said account, with the amount in which it was payable left blank, in order that it might be filled up for such amount as said bank might then be able to pay in cash. Oakley stated to Harold that he wanted the money in cash, as an examination of the convict department was in progress, and he wished to be able to report that the entire amount which the books of that department would show to be due the state was in the treasury in cash.

On the 11th day of March Lacy came to the bank with a blank check drawn on said bank and against said account, signed by J. G. Oakley, president, and said check was filled in by Harold for the sum of $110,000, the amount which the bank was able to pay. In payment of this check there was delivered to Lacy $72,000 in cash, $22,000 of which was supplied by said bank, and $50,000 of which was furnished by the Montgomery Bank & Trust Company. The $22,000 furnished by the Montgomery Savings Bank was taken by Harold to the Montgomery Bank & Trust Company's office, to which place he went, accompanied by Lacy, and there placed in a pine box, together with the $50,000 furnished by the last-named bank. This box was sealed and placed in the vaults of the Montgomery Bank & Trust Company, with the understanding that Lacy would call for it the following day. At the same time Lacy was given two pieces of exchange on foreign banks, one for $18,000, and one for $20,000, each payable to the order of J. G. Oakley, president. These pieces of exchange were later indorsed by Oakley, and deposited to the credit of Oakley, president, in the Exchange National Bank of Montgomery.

On the following day Lacy called at the office of the Montgomery Bank & Trust Company, and was given, and went off with, the box containing the $72,000. This box he took into an automobile with him, and was driven to his residence, into which he went, carrying the box with him. Remaining therein for about ten minutes, he emerged with the box and a suit case, and was driven to the Union Station, where he gave the suit case to a negro, and told him to check it at the parcel room, and then got out of the car and went into the station. When he returned, he was driven around various streets of Montgomery, and finally called at the Exchange Na-

tional Bank, where, having previously ascertained that he could get cash to the extent of $18,000 on the deposit made the previous day, he presented Oakley's check for $18,000, which was paid to him in cash. Dismissing the automobile, he left the pine box in it, and, in answer to the inquiry of the driver, said that he did not care what became of the box. The driver threw it out on the ground, it being empty. Harold testified that both Oakley and Lacy stated that nothing but cash would do, as the convict department was being examined, and they wanted to report cash on hand.

During the morning of the 12th of March, Lacy, by appointment, met Trawick, another clerk of the convict department, at a downtown saloon, and gave him two checks, each signed by Oakley, as president, one on the First National Bank of Birmingham, and one on the American Trust & Savings Bank, the two checks aggregating about $117,000, the exact amount disclosed by the books of the convict department to be due the state. These checks were dishonored, the convict department having $1 to its credit in one of said banks, and nothing in the other.

It was also shown that C. B. Brown, one of the state's witnesses, delivered to Lacy, to be turned over to Oakley or left on Oakley's desk, while the defendant was in the office, a check for $12,000, signed by Woolfolk, as cashier of the First National Bank, and payable to Brown; that this check was given for the purchase of timber on lands of the state in Elmore county; that the check was indorsed by Brown, and the evidence tended to show Lacy either deposited this check or collected it, and that its proceeds were a part of the funds which he embezzled.

After dismissing the chauffeur, Lacy disappeared, and though every effort was put forth by the state to discover his whereabouts and effect his capture, he remained at large until his voluntary surrender in January, 1914. Lacy was indicted, the indictment containing a number of counts charging, respectively, the embezzlement and the larceny of $50,000, was convicted thereunder, and from that judgment of conviction the appeal here considered is prosecuted. The case was submitted to the jury upon counts 1, 2, 3, 4, 5, 7, 13, 14, 16, 21, 26, 27, 28, 29, and 31 of the indictment, which said counts the reporter will set out in full. The reporter will set out in full the excerpts from the oral charge of the court to which the defendant excepted and the refused charges referred to in the opinion.

The following are counts in the indictment directed to be set out: (1) Omitting formal charging part, Theo Lacy, alias, being at the time a public officer of the state of Alabama, to wit, a clerk of the board of convict inspectors, the same being one of the officers designated in section 6485, Code of Alabama, knowingly converted to his own use money received by him in his official capacity to about the amount of $50,000, which had been received by him in his official capacity as aforesaid.

(2) Theo Lacy, who was at the time the agent of James G. Oakley, embezzled or fraudulently converted to his own use, or fraudulently secreted with intent to convert to his own use, money to about the amount of $50,000, which came into his possession by virtue of his said office or employment.

(3) Theo Lacy, being at the time the bailee or trustee of the state of Alabama, embezzled or fraudulently converted to his own use money to about the amount of

$50,000, which had come into his possession by virtue of such bailment or trusteeship.

(4) Theo Lacy, being at the time the bailee or trustee of the state of Alabama, did embezzle or fraudulently convert to his own use bank notes, money, checks, or bills of exchange of or about the amount of $50,000, and of that value, the property of the state of Alabama, which came into his possession as such bailee or trustee.

(5) Theo Lacy, who was at the time the agent or servant of James G. Oakley, did embezzle or fraudulently convert to his own use, or fraudulently secrete with the intent to convert to his own use, bank notes, money, checks, bills of exchange, of or about the amount of $50,000 and of that value, the property of said James G. Oakley, which came into his possession by virtue of his office or employment.

(7) Theo Lacy, who was at the time agent of the Montgomery Savings Bank, a corporation, did embezzle or fraudulently convert to his own use, or fraudulently secrete with intent to convert to his own use, bank notes, money, checks, or bills of exchange of or about the amount of $50,000, and of that value, the property of the said Montgomery Savings Bank, a corporation, which came into his possession by virtue of his office or employment.

(13) Same as 3.

(14) Same as 5.

(16) Same as 7.

(21) Theo Lacy, being at the time the clerk, agent, or servant of James G. Oakley, as president of the board of inspectors of convicts of the state of Alabama, did embezzle or fraudulently convert to his own use money

to about the amount of $50,000, which came into his possession by virtue of his office or employment.

(26) Theo Lacy, alias, feloniously took and carried away $2,000 of the lawful gold coinage of the United States and $48,000 of the lawful currency of the United States of the aggregate value of $50,000, a more particular description of which is to the grand jury unknown, the personal property of the state of Alabama.

(27) Same as 26, except that it is alleged to be the personal property of the Montgomery Savings Bank, a corporation.

(28) Same as 26, except that it is alleged to be the personal property of the Montgomery Bank & Trust Company, a corporation.

(29) Same as 26, except that it is alleged to be the personal property of James G. Oakley.

(31) Theo Lacy, alias, feloniously took and carried away $12,000 of the lawful currency of the United States of America, a more particular description of which is to the grand jury unknown, the personal property of Cyrus B. Brown.

The following are the excerpts from the court's oral charges, to which exceptions were reserved: Was it competent for the board of convict inspectors to authorize defendant to go to the bank and collect these checks for the purpose, as there is evidence tending to show, avowedly at least, of paying the cash over to the state? I think it was within the power of the board of convict inspectors; that they could require that under the statute which says that the clerk may perform such other duties as may be required by the board. I think it would be a narrow and unreasonable construction of the law to hold that the president of the convict board would have to go in person and collect every claim due the

state. It would perhaps be impossible, and, if he is allowed to use any agent for that purpose, surely it would be allowable for him to use his chief clerk of the board, and I think it was within the right of the board to require that duty of defendant. Now, did they require it? Is the evidence sufficient to show that by the usage of the office that they required it? Is the evidence sufficient to show that defendant acted in that capacity and held himself out as acting in an official capacity in that direction in such a way as he would be precluded from denying his authority and his official capacity as an officer of the state of Alabama? These are questions dependent upon the sufficiency of the evidence. I have given you the rules of law as I understand them with regard to official capacity as averred in such counts. If you should find that defendant did act in his official capacity in getting into the possession of this $50,000, and that he knowingly converted it to his own use, after having received it in his official capacity, then he would be guilty of embezzlement under the first count. If, from the evidence, however, you are not satisfied that he was acting within his official capacity as an officer of the state of Alabama, but that he was acting in some capacity which made him liable to the state for a proper use of those funds as an agent of some sort of the state, why then you might consider some of the other counts in the indictment in that respect. The seventh count charged him in the relation of agent of the Montgomery Savings Bank, thus, for instance, if you should find from the evidence that the Montgomery Savings Bank either expressly or impliedly delivered on the check of James G. Oakley, president of the board of convict inspectors, a large sum of money—$50,000, I believe it is charged here—to the defendant, and if you believe from the evidence that that was delivered to him on an implied

[Lacy v. The State.]

agency or implied contract that he would deliver the money paid on this check to James G. Oakley, president of the board of convict inspectors, bona fide and in good faith, if you believe that the evidence justifies that view, then you must find from the evidence that defendant was acting as the agent of the Montgomery Savings Bank for that purpose. He might have been an agent of the convict department to collect the money on the check, and when the money was delivered to him, if you find that it was delivered to him by the Montgomery Savings Bank on that check, and on an implied or express agreement that he should deliver it to the convict department or to the treasurer of the state, it would be within your power to find that he was acting also as the agent of said bank, and if while so acting, and thus coming into possession of the funds, he fraudulently, at a subsequent time, however short, converted them to his own use, that would be embezzlement in that capacity.

The following charges were refused to defendant: (57) If you believe from the evidence that the grand jury which found the indictment on which defendant is here tried knew at the time it found said indictment a further description of the money or currency which defendant is charged with taking than is stated in counts 26, 27, 28, 29, and 31 of the indictment, defendant cannot be convicted under those counts.

(84) Same as to the twenty-sixth count.

(85) Same as to the larceny count.

(48) The disappearance of this defendant after the drawing of the money from the bank is not, as a matter of law, evidence of guilt. Unless his disappearance was caused by a consciousness of guilt, it may not be considered as a circumstance against him, and the jury, in considering this disappearance, may look to the fact that he returned without being arrested.

[Lacy v. The State.]

(49) The fact that this defendant disappeared after the drawing of the money from the bank is not proof of any offense charged in this indictment.

(50) The presumption of innocence of defendant may be sufficient to overturn any inference or doubt in the minds of the jury as to whether the money was delivered by Lacy to Oakley.

(51) The presumption of innocence of defendant follows him, as a matter of evidence, throughout the trial until a verdict is agreed upon by the jury, and such presumption of innocence will be considered by the jury in ascertaining whether the money was delivered by defendant to Oakley.

(58) If you believe that defendant, at the time he received the money from the bank, had no intent to injure or defraud the bank, then you will find him not guilty, and, if you have a reasonable doubt of the fact that at the time he received the money he had the intent to embezzle the same or fraudulently convert the same to his own use, you must acquit him.

(61) The court charges the jury that, unless the evidence, and the evidence alone, has satisfied this jury and each man on this jury that defendant did not deliver to James G. Oakley the money mentioned in the indictment, then the jury cannot convict this defendant of the larceny or embezzlement of this money.

(62) Same as 61 as to an accounting to James G. Oakley for the money.

(81) If you are not satisfied beyond a reasonable doubt from the evidence as it was given you from the witness stand that Oakley did not receive the $50,000 mentioned in the indictment, or about that amount, you cannot convict defendant of embezzlement.

(86) Practically the same as 81.

(71) If you are reasonably doubtful as to the proof in this case of any material allegation in the indictment, you must acquit defendant.

(88) When a good or bad motive for doing an act can be imputed to a person doing the act, the law says the good motive must be imputed to him if the same can be done from the evidence reasonably to the satisfaction of the jury, and before the jury can say that defendant in this case was guilty they must be satisfied from the evidence beyond all reasonable doubt that when he received the money or property described in the indictment he intended to embezzle it, and, if you have a reasonable doubt growing out of the evidence that defendant at the time intended to embezzle the same, you must find him not guilty of the offense of embezzlement.

(89) If there is no proof in this case that defendant failed to deliver to the rightful person the money and property or either, alleged in the indictment to have been embezzled, then the jury must not guess what defendant did with said money and property, or either.

(A) Before the jury can convict defendant under either count of the indictment, they must believe beyond a reasonable doubt that defendant either took feloniously with the intent to steal, and carried away with the intent to deprive the owner of his or its property, or that, being in possession of the money lawfully as the agent or bailee of another, he knowingly or fraudulently embezzled it, and, if the evidence of defendant's acts are consistent with an honest purpose on his part to get the money to the bank in Birmingham, to meet Oakley's checks for $117,000, or if any of the evidence leaves any reasonable doubt in the minds of the jury that defendant acted with a dishonest purpose, they, under the law, as a duty, must acquit him.

[Lacy v. The State.]

(B) If the evidence of defendant's acts are consistent with an honest purpose on his part to get the money taken from the Montgomery Bank & Trust Company to Birmingham, to there meet Oakley's checks on the Birmingham bank, that was certified into the state treasury, or if the evidence of defendant's acts leaves a reasonable doubt in the minds of the jury that defendant had the dishonest purpose not to so get the money to the Birmingham bank to meet the checks, then it is the duty of the jury to acquit defendant.

(E) If the jury believe from the evidence that Lacy took the money from the pine box and put it in a suit case or valise, and took it to the railroad depot and checked it with the honest purpose and intent of having it reach the banks in Birmingham to meet the checks signed by Oakley and payable to the state treasurer, then he cannot be found guilty of larceny.

(F) There is no evidence in this case tending to show that defendant, Lacy, either stole or embezzled any of the moneys of the convict department prior to the time that the money was delivered to him in the pine box at the bank of the Montgomery Bank & Trust Company.

RUSHTON, WILLIAMS & CRENSHAW, and HILL, HILL, WHITING & STERN, for appellant.

R. C. BRICKELL, Attorney General, W. L. MARTIN, Assistant Attorney General, R. B. EVINS, and STEINER, CRUM & WEIL, for the State.

BROWN, J.—The counts of the indictment on which the case was submitted to the jury are substantially in the language of the statute to which they are each referable, and the Code forms prescribed for the offense intended to be charged thereby, and, as has been repeatedly held, are sufficiently full and specific, if the defendant,

as charged, is within the provisions of the statute.—
*Davis v. State,* 141 Ala. 84, 37 South. 454, 109 Am. St.
Rep. 19; *Johnson v. State,* 152 Ala. 46, 44 South. 670;
*Coleman v. State,* 150 Ala. 64; 43 South. 715; *Monroe
v. State,* 111 Ala. 22, 20 South. 634; *Wall v. State,* 2 Ala.
App. 157, 56 South. 57; *Gleason v. State,* 6 Ala. App. 49,
60 South. 518; *Traylor v. State,* 100 Ala. 142, 14 South.
634; *Jordan v. State,* 5 Ala. App. 229, 59 South. 710;
*Brannon v. State,* 191 Ala. 29, 67 South. 1007; *Bush v.
State,* 12 Ala. App. 260, 67 South. 847. There is no
vitiating uncertainty introduced into count 4 by the
averment that the property embezzled or converted by
the defendant was "of or about the amount of $50,000,
and of that value."—*Phelps v. People,* 72 N. Y. 334. The
only possible construction that can be placed on this lan-
guage is that the bank notes, money, checks, or bills of
exchange were of about the amount of $50,000 and of
about the value of $50,000, and thereby making it certain
to a common intent that the property embezzled was
of greater value than $25, and the offense a felony.—
*Thompson v. State,* 48 Ala. 165; *Lyon v. State,* 61 Ala.
224. Furthermore, the statute authorized the property
to be described in "general terms," and the language
adopted by the pleader is expressly authorized by the
statute, and is sufficient.—Code 1907, § 6843; *Walker v.
State,* 117 Ala. 42, 23 South. 149; *Gleason v. State,
supra; Noble v. State,* 59 Ala. 73; *Mayo v. State,* 30 Ala.
32.

Count 12, referred to in argument of counsel for ap-
pellant, was charged out of the case by the trial court,
and will not be treated, as no possible prejudice could
have resulted to the defendant from the rulings on the
demurrer to that count.

The criticism of counsel for appellant that counts 1,
2, 3, and 4 "fail to aver that the money which defendant

embezzled was in his possession by virtue of his office or employment at the time of the alleged embezzlement" cannot be sustained, and is fully answered by our own case of *Gleason v. State, supra*, where this identical question is held against appellant's contention. The court, speaking by WALKER, P. J., said:

"We think that an averment to the effect that the defendant, being at the time the agent or clerk of another, did embezzle or fraudulently convert described personal property of his principal which had come into his possession as such agent or clerk, sufficiently shows that his relation to the property mentioned was such as to make it the subject of the offense created by the statute. The statement conveys the idea of possession or custody which was lawful and within the authority conferred by the agency alleged, so as to make the defendant's holding of the property one in trust for the use or benefit of his principal. This amounts to the same thing as saying in the language of the statute that the defendant's possession was by 'virtue of his office or employment.' "

It is urged as an objection against some of the counts charging embezzlement that they aver that the defendant "embezzled or fraudulently converted to his own use or the use of another" the property of his principal, without averring the name of the third person designated as "another." The clear import of this averment is that the defendant was guilty of a fraudulent breach of the trust that had come into his possession by virtue of the fiduciary relation, and a wrongful and fraudulent assumption of dominion over it in total disregard and denial of the rights of the true owner (*Wall v. State,* 2 Ala. App. 164, 56 South. 57; *Boutwell v. Parker,* 124 Ala. 342, 27 South. 309; 15 Cyc. 521g), and it is wholly unimportant as to whether the defendant was the recipi-

ent of the benefits of the crime, or whether a third person reaped the benefits thereof. For this reason, it was not necessary for the indictment to aver the name of such third person.

The averment in the first count of the indictment that the defendant at the time of the commission of the offense charged was "a public officer of the state of Alabama, to-wit, a clerk of the board of inspectors of convicts, the same being one of the officers designated in section 6485 of the Code of Alabama," and that he converted to his own use money received by him "in his official capacity," presents one of the serious questions in the case. The courts of the state take judicial notice of the public officers of the state, and the source from which they derive their authority, and, if these averments are inconsistent with the provisions of the statute, they are negatived thereby, and must necessarily fail.—*United States v. Smith,* 124 U. S. 531, 8 Sup. Ct. 595, 31 L. Ed. 534; *Cary v. State,* 76 Ala. 778; *Beggs v. State,* 55 Ala. 108. The Supreme Court of this state has not laid down any general rule to govern in determining what is required to constitute a state officer, or a person an officer of the state. Its holdings in this respect are that, where one derives his authority directly from the state by legislative enactment, and the duties imposed by the enactment are of a public character, and the terms and compensation are definitely fixed, such person is an officer of the state.—*State, ex rel. Robertson v. McGough,* 118 Ala. 164, 24 South. 395. "Every public officer, judicial, ministerial, or executive, deriving place and authority from the Constitution or laws, is an officer of this State."—*State, ex rel. Winter v. Sayre,* 118 Ala. 31, 24 South. 89.

That an office created by legislative enactment, which concerns the general public as touching the administra-

tion of public justice, although exercised within defined territorial limits, is an office of profit under and within the meaning of the Constitution, prohibiting one from holding an office, unless elected thereto by the people, created by the Legislature of which such person is a member, was the holding in *Montgomery v. State, ex rel., etc.,* 107 Ala. 372, 18 South. 157, and in one of our recent cases it was held that the "deputy harbor master" selected as prescribed, and by authority of chapter 114 of the Code of 1907, regulating navigation, to whom the state, in the exercise of its police power, had granted authority to carry into effect its policy in the protection of navigation, whose duties are defined by the statute, and who was required to give a bond for their faithful performance, receiving fees or emoluments for services rendered, is an officer of the state.—*American Bonding Co. v. New York & Mexican Whiting Co.,* 11 Ala. App. 578, 66 South. 847. "A public office is the right, authority, and duty, created and conferred by law, by which for a given period, either fixed by law or enduring at the pleasure of the creating power, an individual is invested with some portion of the sovereign functions of the government, to be exercised by him for the benefit of the public, and the individual so invested is a public officer." —Mechem on Public Officers, § 1.

"An office is defined to be a public charge or employment, and he who performs the duties of the office is an officer. * * * Although an office is an employment, it does not follow that every employment is an office. A man may certainly be employed under a contract, express or implied, to do an act, or to perform a service, without becoming an officer. But, if the duty be a continuing one, which is defined by rule prescribed by the government, and not by contract, which an individual is appointed by the government to perform, who enters

upon the duties appertaining to his status, without any contract defining them, it seems very difficult to distinguish such a charge or employment from an office, or the person who performs the duty from an officer."— Public Officers, by Throop (section 3), quoting from *United States v. Maurice,* 2 Brock. 96 Fed. Cas. No. 15,747, per Marshall, C. J.; *Shelly v. Alcorn,* 36 Miss. 273, 72 Am. Dec. 169; *Bunn v. People,* 45 Ill. 397; Mechem on Public Officers, § 2; *Michael v. State, ex rel., etc.,* 163 Ala. 425, 433, 50 South. 929.

"A government office is different from a government contract. The latter, from its nature, is necessarily limited in its duration and specific in its objects. The terms agreed upon define the rights and obligations of both parties, and neither may depart from them without the assent of the other."—*United States v. Hartwell,* 73 U. S. 385, 402, 18 L. Ed. 830.

The power to subject an individual to involuntary servitude as a punishment for crime is an attribute of sovereignty that can only be constitutionally exercised by the state or under its express authority.—Const. 1901, § 32. The convict department belongs to the executive division of the government, and is an agency of the state designed to aid in the administration of public justice in affording adequate and just means for punishing criminals.—*Ex parte Mayor, etc., of Birmingham,* 116 Ala. 186, 22 South. 454. This department consists, not only of the three inspectors appointed by the Governor, but of these and the subordinate officers provided for by the statutes creating the department. The three clerks of this department are appointed by the president of the board, who is the head of that department, by and with the approval of the Governor.—Code, § 6485. And it is made the duty of these three clerks, under the direction of the president of the board of inspectors, to keep the

[Lacy v. The State.]

books and records pertaining to state and county convicts, and to perform "such other duties as may be required by the board." Section 6498 prescribes of what the records shall consist and what they shall contain. By section 6508 all of such officers, which includes the three clerks, are required to take a prescribed official oath, and in section 6509, fixing salaries of officers, one of the clerks is designated as "chief clerk of the board," and the others as "associate clerks," and their salaries are fixed, and provision made for payment thereof, along with the salaries of the three inspectors, out of the earnings of the convicts and from "incomes, rents, and profits of land or property pertaining to the convict system." The duties of these clerks are prescribed by law, and are continuing duties, regardless of changes in the personnel of the staff. We entertain the opinion, and therefore hold that the clerks of the convict department were in the sense used in the indictment officers of the state, and, if funds from that department belonging to the state came into the hands of the defendant by virtue of his office as a clerk of the board of inspectors of convicts, and he fraudulently converted them to his own use, as charged in the first count of the indictment, he is guilty of the offense of embezzlement as denounced by section 6838 of the Code, as amended by an act approved November 23, 1907 (Acts. 1907, p. 162).— *Vaughn v. English*, 8 Cal. 39; *United States v. Hartwell*, 6 Wall. (73 U. S.) 358, 402, 18 L. Ed. 830; *Miller v. Lewis*, 4 N. Y. 554; *Gibbs v. Morgan*, 39 N. J. Eq. 126; *State, ex rel., etc., v. Clark*, 66 N. C. 59, 8 Am. Rep. 488; *People v. Bledsoe*, 68 N. C. 457; *Bradford v. Justice of Inferior Court*, 33 Ga. 332.

It is insisted that the matter of handling the funds of the convict department, in view of the provisions of the statute requiring all accounts to be paid to the presi-

dent of the board, and requiring him to make quarterly settlement, is a personal trust committed to the president which he must perform in person. The general rule of law is that, when duties of a judicial nature, such as involve the exercise of judgment or discretion, are conferred upon a public officer, the right to perform such duties cannot be delegated to another, in the absence of an express grant of authority.—Mechem on Public Officers, § 566; 36 Cyc. 859. But mechanical or ministerial duties may be delegated to deputies, clerks, or assistants.—Mechem on Public Officers, § 568; 36 Cyc. 859; Throop on Public Officers, §§ 569, 570. Where the law provides a clerical force to perform the ministerial duties of a department, prescribing their duties in general terms, as in the case of the convict department, any duty of a ministerial or mechanical nature, such as receiving, counting, paying into the proper channels, and keeping a record of the funds of the department, in the absence of an express provision prohibiting it, is within the range of the authority of the clerical force.

The law clearly contemplates that money belonging to the state will be brought into the state treasury through the convict department, and while it requires all moneys due the department to be paid to the president of the board of inspectors, and requires him to make quarterly settlement with the state auditor, it clearly contemplates that a complete record and strict account of all such funds shall be kept by the clerical force in the office of the president, and to that end necessitates counting and handling of cash by that force under the supervision and "direction" of the president.—Code, §§ 6480, 6485, 6498-6500. The question, therefore, as to whether the funds alleged to have been embezzled by the defendant came into his hands by virtue of his office, was a matter of evidence.

The statute authorizes the president of the board of inspectors, with the approval of the Governor, to appoint "three clerks," and in section 6509 these clerks are designated as "chief clerk of the board" and "associate clerks." It was therefore permissible to allege in the indictment, under videlicet, the title or designation of the officer as "a clerk of the board of inspectors of convicts, the same being one of the offices designated in section 6485 of the Code of Alabama," and under this averment proof that the office held by the defendant was designated either as "chief clerk of the board" or as "associate clerk" was admissible and within the issues. —McDade v. State, 20 Ala. 81; McCain's Criminal Law, § 656a.

It is a truism that public office is a public trust, and an agency of the government to conserve the public interest.—6 Words and Phrases, 4922, 4933; Ex parte Yale, 24 Cal. 241, 244, 85 Am. Dec. 62; People v. Duane, 121 N. Y. 367, 24 N. E. 845.

Any fund or property belonging to the state coming into the hands of a public officer of the state by virtue of his office ipso facto constitutes such officer a trustee for the state.—Wolffe v. State, 79 Ala. 206, 58 Am. Rep. 590.. And if the fund or property was received by such officer to be held by him for a specified purpose or to be delivered to another officer of the state, for the use of the state, although the officer had no right to receive it, such officer would be a bailee of the state and liable as such.—Lang v. State, 97 Ala. 41, 12 South. 183; Schouler on Bailments, §§ 2-4; Compson v. State, 102 Ark. 213, 143 S. W. 897, 903; Storms v. State, 81 Ark. 25, 98 S. W. 678; U. S. v. Thomas, 15 Wall. (82 U. S.) 344, 21 L. Ed. 89; York County v. Watson, 15 S. C. 1, 40 Am. Rep. 678; Commonwealth v. Chatham, 50 Pa. 181, 88 Am. Dec. 539.

Proof that the person named in the indictment as owner of the property had only·a special property or interest in the thing is all that was necessary. It is not essential that the person named in an indictment for larceny or embezzlement as owner should be one holding the legal title or general ownership, it is enough that such person have a special property or interest in the thing.—*Fowler v. State,* 100 Ala. 96, 14 South. 860; *Rollins v. State,* 98 Ala. 79, 13 South. 280; *Butler v. State,* 91 Ala. 87, 9 South. 191. The New York court thus announces the law on this subject: "It is not necessary that the indictment should name the person as owner, and him only, who has the general ownership of the property, a title absolute, which he can maintain against the   *   *   *   world. It is enough if any one be named who has a special property in the thing stolen. A special property is a qualified or limited right such as a bailee of it has; and a bailee of property is one to whom the thing has been delivered, to be held according to the purpose or object of the delivery, and to be returned to the bailor, or delivered over to some other, when that object has been accomplished, or for the purpose of accomplishing it; and the obligation of the bailee may arise by implied contract, as well as express agreement. Thus a finder of a lost chattel or chose in action may become a bailee of it by the act of finding and keeping it in custody. And so, too, is the recipient of a chattel or chose in action, either directly from the hands of the absolute owner, or through the intervention of a private agency such as a manager, or a public agency such as a common carrier of the government mails. Hence this character of bailee, with this special property·in the thing, may arise without any express agreement to receive and to hold for a particular purpose. It may arise from the bare fact of the thing coming into the actual possession

and control of a person fortuitously, or by mistake as
to the duty or ability of the recipient to effect the pur-
pose contemplated by the absolute owner; and I see no
reason why a person who is the incumbent of a public
office may not become in his official capacity such bailee,
and may not properly deliver the thing in his possession
to his successor in office, charged with that continuing
duty as to it which will confer on him a special interest
in it. For instance, suppose that in the course of inter-
change of printed public statutes and other books be-
tween the states a package from Maine, meant for the
state library of this state, or for another state, addressed
to the secretary of state, should reach Albany at the
close of the last day of his term of office, and should be
left at his official rooms in the state hall from the ex-
press company's delivery wagon; can it be said that he is
not under a duty to the real owner, whoever it may be,
to care for it through the day, and that his successor
would not, on the next day, receiving it with the other
property in those rooms, be subject to the same duty?
The duty thus put upon them in turn would give them
in turn a special right and ownership in the property,
which could be defended against all but the absolute
owner. The statute law might not impose upon the
secretary of state any duty to this state in relation to the
parcel; but having, by reason of his official position, had
it committed to him, he is subjected to a duty to use
ordinary care in the preservation of it from loss or vio-
lence. If it be granted that he does not receive it in his
official capacity, for the reason that the law does not
make it a duty of his office so to do, let us then add to
the facts supposed that it has been the course of his office
to take in such packages and deliver them to the proper
department, or to return them if missent, does he not
then owe a duty of ordinary care until one or the other

of these objects has been reached? If it be said that, in addition to the absence of law imposing such official duty, it does not appear that, in fact, the package came to his hands or his notice, does not the fact that he has permitted deputies, clerks, and servants, appointed or continued by him, and removable by him at his pleasure, to receive such packages and forward or return them in orderly course, put upon him as an individual the duty of ordinary care when one comes to his office rooms in the regular course of business. We think that there can be but an affirmative answer to these queries. And then it follows that there was in the public officers into whose possession this draft came by being put into the custody of one of their servants or clerks, for the purpose of being converted into money for deposit in the state treasury, a duty to the county of Niagara and to its treasurer, to see that that purpose was accomplished, or the draft sent back with notice that that mode of receiving payment of state taxes would no longer be kept up. * * * There being a duty, there was a special property in the draft accompanying that duty, so that there was a proper averment in some count of the indictment of an owner of the property. The special interest acquired by the public agents of the state was the interest of the state. * * * It is held in *People v. McDonald,* 43 N. Y. 61, that if money or property is delivered by the owner to a person for mere custody or charge, or for some specific purpose, the legal possession remains in the owner, and a criminal conversion of it by the custodian is larceny. It is clear that the plaintiff in error had the draft for the special purpose of making the proper entries on account of it in the books of the state treasurer, and of putting it into the state deposit bank later in the day, and that all the interest he had in it until that special purpose could be accomplished was the mere charge or

custody of it.   He had no more than this, for that purpose could be changed by the state treasurer, and that custody interrupted at any moment."—*Phelps v. People,* 72 N. Y. 334.

In drawing the indictment in this case, the practice approved by the Supreme Court seems to have been followed.—*Rollins v. State,* 98 Ala. 79, 13 South. 280; *Butler v. State,* 91 Ala. 87, 9 South. 191; *Hornsby v. State,* 94 Ala. 55, 10 South. 522.

There was no impropriety in allowing the witness Seibels to testify, in substance, that there was no evidence before the grand jury that returned the indictment showing a more particular description of the money alleged to have been stolen.—Code, § 7298; *Burton v. State,* 115 Ala. 1, 22 South. 585; *Blackman v. State,* 98 Ala. 77, 13 South. 316.   The purpose of this evidence was not to impeach the testimony of Harold, but to sustain the averments of the larceny counts in the face of Harold's testimony tending to show that there was some evidence before the grand jury from which they might have found a more particuar description.   After the witness Seibels had testified that there was evidence that the money consisted of gold coin amounting to $2,000 and currency to the amount of $48,000, he was asked the following question:   "Wasn't there evidence before the grand jury as to the kind of money it was?"   This question merely called for a repetition of the previous statement of the witness, and the court was correct in sustaining the objection to it.   The testimony of this witness shows, and as for the matter there was no conflict in the evidence of the point, that Harold testified before the grand jury, and the defendant was not prejudiced by the ruling of the court sustaining the objection to the question to Seibels calling for this fact.

The testimony of the witness Trawick tending to show the general course of conducting the business of the convict department as carried on in the office of the president of the board, and the duties usually performed by the defendant, was clearly competent on the issue as to whether the money, the subject of the alleged crime, came into defendant's possession by virtue of his office.— Jones on Evidence, 356, 358; *Robinson v. Greene,* 148 Ala. 434, 43 South. 797; 31 Cyc. 1650. There was no error in allowing the books kept in the convict department to be received in evidence, or in admitting the testimony of Trawick that certain checks found in defendant's desk were not entered on the register.—*Christian v. Coleman,* 125 Ala. 171, 27 South. 786; *Stevenson v. Moody,* 85 Ala. 33, 4 South. 595; *Lang v. State,* 97 Ala. 41, 12 South. 183.

Any emotion or feeling of surprise on the part of the examiner of public accounts resulting from defendant's conduct was not admissible evidence on any theory, and the court properly sustained the objection of the solicitor to questions calling for this evidence.

"Human emotions and human passions are not in themselves physical entities, susceptible of proof, as such.—*Thornton v. State,* 113 Ala. Ala. 47, 21 South. 356, 59 Am. St. Rep. 97; *Carney v. State,* 79 Ala. 14.

The letter signed by Oakley and addressed to the defendant was relevant and admissible on the question of the defendant's authority to receive, handle, and deposit the funds of the department. It was also relevant as showing the intimate relation between the defendant and Oakley, and in support of the state's theory that a conspiracy to convert the funds of the department existed between defendant and Oakley, which, if true, destroyed defendant's theory that a delivery of the funds alleged to have been converted by defendant to Oakley would

relieve defendant from liability. On this issue in the case any irregularity in the conduct of the office, or anything done therein out of the usual course of business tending to shed light on or disclose the fraudulent purposes or motives of either Oakley or the defendant, was properly admitted as evidence in the case. Although the evidence must be satisfactory and convincing to the exclusion of every reasonable doubt of guilt, it need not be direct in character, but may consist of circumstantial or presumptive evidence from which the fraudulent and criminal intent may be inferred.—Jones on Evidence, §§ 13, 192; 20 Cyc. 115 (c).

The evidence clearly afforded an inference that the defendant fraudulently converted the money to his own use, and that he had never restored it to the treasury or other legal custodian; and there was evidence tending to show that the president of the board had guilty connection with the conversion and embezzlement by Lacy. The argument of the solicitor objected to was not the statement of a fact outside of the range of the evidence, and the legitimate inferences afforded by the evidence. The language used appears to have been uttered as an inference, and we cannot say that it was wholly unsupported by the evidence and should have been excluded. The assertion that "his counsel know he is guilty" cannot be construed to mean that they possessed such knowledge outside of the evidence in the case. Manifestly, the purport of this assertion was that the evidence was so plain that those who had heard the evidence given during the trial must be convinced of defendant's guilt. There was no error in overruling the objection of the defendant to this argument.—*Hobbs v. State,* 74 Ala. 39; *Langham v. State,* 12 Ala. App. 461, 68 South. 504.

The principles above stated, in discussing the sufficiency of the first count of the indictment, justified the

instructions given the jury in the oral charge of the court, and, when the portions of the charge excepted to are considered in the connection they sustain to the charge as a whole, no error is shown.—*Winter v. State,* 132 Ala. 32, 31 South. 717.

All drafts and checks coming into the hands of James G. Oakley, as president of the board of inspectors of convicts, by virtue of his office, and payable to him as such president, were the property of the state, and a general deposit of these checks and drafts in bank, by Oakley to his credit, thus authorizing the bank to collect them and mingle the proceeds thereof with the funds of the bank, was a conversion of this property of the state.—*Alston v. State,* 92 Ala. 124, 9 South. 732, 13 L. R. A. 659. The funds represented by these checks and drafts were trust money in the hands of Oakley, and these checks and drafts bore on their faces evidence that they represented a trust fund, which Oakley held as trustee of the state, and when the bank, with notice of this fact, accepted a general deposit of them, entering the proceeds to the credit of Oakley, the bank became a trustee, in invitum with him and liable to account to the state for the identical property received from Oakley.— *Wolffe v. State,* 79 Ala. 201, 58 Am. Rep. 590. The bank had the right to discharge this liability, and could only do this by restoring to the state treasury the identical property so converted by it, or its equivalent in cash (Const. 1901, § 100), and, if the Montgomery Savings Bank turned over to the defendant such property or its legal equivalent in value to be paid into the state treasury for it, the defendant was pro hac vice the agent of the bank, and if after he received the funds for that purpose he fraudulently converted them to his own use, he would be guilty of embezzlement, and this notwithstanding he may have accepted the money with

[Lacy v. The State.]

the criminal intent.—*Barr v. State,* 10 Ala. App. 111, 65 South. 197. And if he took the property with a felonious intent and carried it away, he would be guilty of larceny.

As heretofore stated, as to whether the defendant had official authority to receive the money from the bank was one of fact for the jury, and, as we have shown, this averment and such finding is not inconsistent with or negatived by any of the provisions of the statute regulating his official duties. If he did not have authority, as an officer of the state, to receive the funds, but, acting under the instructions of his superior, as the jury had a right to find from the evidence, he went to the bank and took therefrom money deposited in the name of Oakley to be carried and deposited in the state treasury, he was for that purpose an agent or servant of Oakley, as president of the board of convict inspectors. On the other hand, if the defendant accepted from Brown the check payable to and indorsed by Brown for the purpose of collecting it and paying the proceeds into the state treasury, or if the check was left on defendant's desk to be delivered to Oakley, and the defendant collected the check and fraudulently converted the proceeds to his own use, and at the time he assumed dominion over the check he entertained the criminal intent to appropriate the proceeds thereof to his own use, he would be guilty of larceny.—*Verberg v. State,* 137 Ala. 77, 34 South. 848, 97 Am. St. Rep. 17; *Eggleston v. State,* 129 Ala. 83, 30 South. 582, 87 Am. St. Rep. 17; *Dozier v. State,* 130 Ala. 57, 30 South. 396. The question as to whether defendant entertained the criminal intent was, under the evidence, for the jury.—*Verberg v. State, supra; Talbert v. State,* 121 Ala. 34, 25 South. 690.

An application of the principles above stated justifies the rulings of the trial court in the refusal of the affirm-

ative charge as to all the counts and as to each of those on which the case went to the jury.

The counts of the indictment, except count 31, to which charges 57, 84, and 85 relate, describe the property as "$2,000 of the lawful gold goin of the United States of America, and $48,000 of lawful currency of the United States of America, of the aggregate value of $50,000, a more particular description of which is to the grand jury unknown," and count 31 describes it as "$12,000 of the lawful currency of the United States of America, a more particular description of which to the grand jury is unknown." Charge 57 was therefore properly refused, as it predicates an acquittal on a finding by the jury that the grand jury knew at the time it found said indictment a further description, and not a more particular description, of the currency. The charge was correctly refused for another reason; the knowledge which the grand jury had at the time must have been knowledge from the evidence they had before them, and this fact the charge pretermits.

Charge 84 was correctly refused, because it justifies an acquittal if the jury did not believe from the evidence that the grand jury "had before them no other description" of the property, and not a "more particular description" of the property, as charged in the indictment. The charge is faulty in another respect. Before an acquittal could be predicated on this fact, the jury must find from the evidence that the grand jury had knowledge arising from evidence before the grand jury of a more particular description of the property. The absence of evidence of a more particular description at the time the true bill is found is the fact that justifies the averment of unknown particular description.—*Jones v. State,* 115 Ala. 67, 22 South. 566. But the state is not required to prove this

negative averment.—*Childress v. State,* 86 Ala. 77, 5 South. 775.

Charge 85 was properly refused, because it ignores count 31 of the indictment and the tendencies of the evidence supporting this count.

Charge 48 invades the province of the jury, and also singles out and gives undue prominence to the fact of the defendant's return without arrest.

Charge 49 invades the province of the jury.

Charge 50 is argumentative.

Charge 51 invades the province of the jury, in that it ignores the tendencies of the evidence going to show that Oakley had guilty connection with the conversion of the funds by the defendant.

On the principles stated above, even though the defendant received the money with criminal intent, he could be guilty of embezzlement (*Barr v. State,* 10 Ala. App. 111, 65 South. 197), and, although the defendant had no intent to injure or defraud the bank, yet he could be guilty of embezzlement or larceny of the property of the state, as we have shown above. For these reasons, charge 58 was properly refused.

Charges 61, 62, 81, and 86 ignore phases of the evidence tending to show that Oakley had guilty connection with the crime. Some of the counts of the indictment on which the case was submitted to the jury charged embezzlement, while others charged larceny, and the property described in some of the counts is not that described in others, and the ownership of the property is laid in different persons. Although the jury may have been doubtful as to proof of some one or more of the material facts in some one of these counts, yet as to some of the counts they could well have been convinced of the defendant's guilt beyond all reasonable doubt.

These considerations justify the refusal of charge 71.—
*Littleton v. State,* 128 Ala. 31, 29 South. 390.

Charge 88, besides being argumentative, is not a correct statement of the law. The defendant could be guilty of embezzlement, although he had no intention of embezzling the money at the time it came into his possession.

Charges 89 and 90 were misleading. Although there may have been no positive proof of the failure to deliver to the rightful person the money alleged to have been embezzled or stolen, the evidence affords ample room for legitimate inferences that it was never delivered to any one having authority to receive it. Furthermore, these charges ignore the tendency in the evidence that Oakley was a confederate in the crime.

Charges A, B, E, and F were abstract; there was no evidence in the case that Lacy made any effort to send money to the Birmingham bank on which check was drawn by Oakley, and his conduct on the occasion of carrying the suit case to the depot and turning it over to a negro porter to be checked into the checkroom is so contrary to the usual method of handling money in such quantity that it can hardly be said that the evidence affords an inference that it was the defendant's intention and purpose to ship the suit case to the bank at Birmingham.

We find no error in the record, and the judgment of the city court is affirmed.

THOMAS, J., concurs in the conclusion of affirmance reached without committing himself to all that is said in the opinion. PELHAM, P. J., not sitting.