# The State *v*. Montgomery Savings Bank.

### Conversion and Assumpsit.

(Decided February 3, 1917.   Rehearing denied March 26, 1917.
74 South. 942.)

1. **Appeal and Error; Harmless Error; Effect of Recovery.**—Where the judgment is in favor of plaintiff, who appeals, the Supreme Court will not consider as reversible error any ruling of the primary court bearing merely on the naked question of defendant's liability, and not affecting the amount of the damages recovered, however erroneous it may be in fact, because any such ruling, if error, was harmless to plaintiff.

2. **Depositaries; Public Moneys; Discharge of Bank; Payment.**—Where a bank, having on deposit about $100,000 to the credit of the president of the board of convict inspectors of the state, in good faith delivered to such president or his authorized agent, the chief clerk in the convict department, funds or values to the amount of the deposit on the order of the president, the bank was discharged from liability to account to the state for the funds or values thus restored by it to the state's duly authorized and empowered head of the convict department, who was the proper lawfully designated receiptor and custodian of funds coming to the state through the operation and activity of the convict department.

3. **States; Funds of Convict Board; Statute.**—The net balance of funds emanating from the convict department of the state is governed, in respect of its custody by the president of board of convict inspectors and their payment to the treasurer of the state, by the method defined by Code 1907, section 6499, constituting the president the collector of accounts due the state in the convict department, and requiring quarterly settlements by him with the state auditor, whose act in certifying alone authorizes the president to pay to the state treasurer, and the state treasurer to receive, funds derived from the activity of the convict department; the provisions of the section, in connection with section 6515, providing that the state convicts shall be hired at such labor, etc., as may be determined by the board of inspectors, having in view the end of making the system self-sustaining as far as consistent with humane treatment, precluding the application of section 644, authorizing state officials to deposit to the credit of the state treasurer, subject to his order, public funds in their custody.   ·

4. **States; Officers; President of Board of Convict Inspectors; Delegation of Authority.**—The president of the board of convict inspectors could delegate to the chief clerk in the convict department authority to receive from a bank in which they were deposited to the president's credit funds and values belonging to the convict department.

APPEAL from Montgomery City Court.

·   Heard before Hon. GASTON GUNTER.

Action by the State of Alabama against the Montgomery Savings Bank to recover a hundred thousand dollars, Convict

Bureau default. From an insufficient judgment for plaintiff it appeals. Affirmed.

Transferred from the Court of Appeals under Acts 1911, p. 450.

WILLIAM L. MARTIN, Attorney General, STEINER, CRUM & WEIL and R. B. EVINS for appellant. BALL & SAMFORD and LOGAN & LOGAN for appellee.

McCLELLAN, J.— (1) This action was instituted by the state of Alabama against the Montgomery Savings Bank (appellee) to recover the sum of $100,000. The complaint contains the common counts as well as counts declaring upon a conversion by the bank of funds belonging to the state. Following a verdict for the plaintiff assessing the damages at one cent and judgment entered in accordance therewith, the plaintiff moved for a new trial. This motion was overruled. Where the judgment appealed from is in favor of the plaintiff, and plaintiff appeals, this court "will not consider as reversible error any ruling of the primary court bearing merely on the naked question of the defendant's liability, and not affecting the amount of the damages recovered, however erroneous it may be in fact, because, if error, such ruling is error without injury to the plaintiff."—*Randle v. B. R., L. & P. Co.,* 169 Ala. 314, 318, 53 South. 918, 919, and cases there cited.

J. G. Oakley was president of the board of convict inspectors during the year 1912, and up to, to-wit, March 12, 1913. Theo Lacy was chief clerk in the convict department. On March 8, 1913, Oakley, as president, had to his credit on general deposit with the appellee a balance of approximately $40,000. On that day Lacy took to the bank checks and drafts from various parties payable to Oakley, as president, aggregating $103,868.92. These checks and drafts were listed on a deposit slip form on which this appeared: "Deposited with Montgomery Saving Bank, Montgomery, Ala., March 8, 1913. Credit of J. G. Oakley, Prest. * * * Deposited by Theo. Lacy." Aside from the date and names quoted, the face of the form was stereotyped. On the back of each of the checks and drafts, the aggregate amount of which constituted the sum last stated, through the use of a rubber stamp, these words were impressed: "For deposit only, James G. Oakley, President." And on the back of each check or draft,

Oakley, in his own hand, had made this indorsement: "J. G. Oakley, Pres." Subsequent to a specific agreement between the representative of the appellee and Oakley with respect to the collection of these checks and drafts to be stated the total amount represented by them was credited in order upon the existing general deposit account of Oakley as president; the described deposit slip being accepted by the bank without change. On March 11, 1913, in accordance with the agreement just referred to, the check of Oakley as president on the appellee for $110,000 was paid to Lacy, largely in cash, along with exchange for the difference. Lacy absconded therewith, was later tried, and is now serving sentences imposed for his embezzlement. The agreement alluded to, together with the reasons inducing it, was this: Oakley's accounts with the state were in course of examination by a state examiner of accounts, and Oakley desired to have in cash all the funds belonging to the state chargeable against him. Oakley wanted these checks and drafts collected at the earliest moment, and the proceeds in cash delivered for use in settling his accounts with the state. After conference between Oakley and the bank's officer it was specifically agreed that the bank should undertake to serve his purpose by Tuesday, March 11, 1913, though it was also agreed that Oakley would take exchange for the amount the bank could not collect by March 11, 1913, supplementary of the amount in cash that was collected. According to this testimony the bank was created the agent of Oakley to collect the checks and drafts delivered to it on March 8, 1913, and pay the same to Oakley; the agreement as made operating to prevent, as to these checks and drafts, the creation of a general deposit by Oakley with the bank. The state insists that, when the statements and indorsements on the deposit slip and on the checks and drafts and the bank's act of crediting the aggregate amount of these checks and drafts on the general deposit account of Oakley as president and the crediting of the payment of the $110,000 check on that account are considered, at the very least, an issue for the jury to decide was made by these matters of evidence, viz. whether there was a deposit of the amount represented by these checks. In the brief for appellee it is, in effect, admitted that the issue indicated was a matter determinable alone by the jury. Because of the view prevailing in this court, it is not now important to consider the ultimate effect of the issue and of its solution upon the fate of this appeal.

Whether the funds or values delivered to Lacy in consequence of Oakley's check for $110,000 were the result of an order against a general deposit account in Oakley's favor or not is not now regarded as an influential or controlling factor in the present review of the judgment on which this appeal is based.

(2) Our conclusion is that, since Oakley, as president of the board of convict inspectors, was at that time the proper, lawfully designated receiptor and custodian of funds coming to the state through the operation and activity of the convict department, including the collection of demands of the state against debtors to it in consequence of the conduct of its convict department, the delivery in good faith to Oakley or to his authorized agent, Lacy, the chief clerk in the department, by this bank, of funds or values, was a delivery or payment wherefrom resulted the discharge of the bank from liability to account to the state for funds or values thus restored by it to the state's duly authorized and empowered head of the convict department. There is no evidence of mala fides on the part of the bank in making or when making this delivery to Lacy. The evidence is conclusive to the point that the entire basis of this action was and is funds and values delivered to the chief clerk on the order of the president of the board of convict inspectors. Hence, if our stated conclusion is correct, the bank was due the general affirmative charge; and errors, if any, intervening were without prejudice to this appellant. It is provided in Code, § 6515, as follows: "The state convicts shall be hired or employed at such labor and in such places and under such regulations within the state as may be determined by the board of inspectors, with the approval of the Governor, having in view the end of making the system self-sustaining as far as consistent with the humane treatment of the convicts."

Code, § 6480, provides: "The president of the board of inspectors shall superintend the management of the convicts, and all subordinate officers, persons, or guards. It shall be his duty to see that the laws in relation to convicts and the rules of the board of inspectors are enforced; and his orders shall be obeyed by all contractors, officers, guards, and convicts. He has the general oversight of all the officers and convicts and of the land and other property belonging to the several prisons; he may sell by order of the board any personal property not needed at any prison and cover the proceeds into the state treasury to the

[The State v. Montgomery Savings Bank.]

credit of the convict fund, and may order any convict transferred from one prison to another as he may think expedient."

(3) By Code, § 6499, the president of the board of convict inspectors was constituted the collector of accounts due the state in that department; and quarterly settlements were required by him with the state auditor, whose act in certifying alone authorized the president to pay to the state treasurer, and the state treasurer to receive, funds derived from the activity of that department. The provisions of this statute, in connection with that numbered 6515, and the method and practice prescribed by section 6499, precluded the application of the provisions of Code, § 644, whereby state officials were authorized, not required, to deposit, to the credit of the treasurer and subject to his order, public funds in the custody of such officer; the net balance of funds emanating from the convict department being governed, in respect to their custody by the president and their payment to the treasurer, by the exclusive method defined by Code, § 6499.

There is another insistence on the part of the state predicated of the ruling of this court in *Alston v. State*, 92 Ala. 124, 9 South. 732, 13 L. R. A. 659, wherein it was ruled that the general deposit by an officer of a check made payable to him in discharge (when paid) of money due from the drawer to the state or county for a license to carry on a certain business was a conversion of the funds thus, in consequence of the check's payment, passing to the general credit account of the officer on the books of the bank to which it was delivered for collection and credit, the action being against the officer to recover the sum, the bank having failed after the general deposit had become effective. The doctrine of that decision is not applicable to the case under consideration. If the bank involved in the *Alston Case* had actually paid the funds there in question to, or back to, the officer, and the bank had been sued for the money, this court would then have been invited to express its judgment upon the legal effect of circumstances that are present on this appeal, but which were not involved in the Alston appeal. That decision is without bearing on the questions determinative of the case at bar. There is also argument rested upon considerations that are suggested by inquiries necessarily arising where it is sought to bind the state by acceptances of checks or drafts by officers in attempted full discharge of demands in favor of the state. The determination of this appeal does not, in our opinion, involve, in

any influential or controlling sense, those considerations, since the funds and values delivered on Oakley's order to Lacy represented and were the values or funds with respect to which the entire claim of the state in this action is concerned.

As we have indicated, the determinative question on this appeal is whether the delivery of the funds and values to the chief clerk, on the order of the president of the board of convict inspectors, was a lawful restoration, a valid delivery, exonerating the bank from liability to account therefor to the state? A negative response to this question would require, necessarily, the affirmation that in the circumstances surrounding the possession of these funds or checks thus resulting from the conduct of the business of the convict department imposed on the bank the imperative, unavoidable obligation to pay or to deliver them to the state treasurer; that official being, if the president of the convict board was not, the only authorized receiptor or custodian of the funds or values belonging to the state. No positive law to which reference has been made, or which has been discovered, imposed that restrictive duty upon the bank, as the sole means whereby it could acquit itself of liability to account to the state. So far as we are advised, there was no law requiring payment or delivery of funds derived from the operations of the convict department to the state treasurer except through the process defined in Code, § 6499, and none that would have authorized the state treasurer to receive funds from the service here in question otherwise than through the method prescribed in Code, § 6499. If, as appears, there was no authority whereto the bank could refer a payment or delivery of these state funds to the state treasurer or to which the state treasurer could refer as warranting his receipt of these funds, derived from the operations of the convict department, it would seem to be quite clear that the process for surrendering these funds, and thereby acquitting the bank of accountability therefor, was to pay or deliver such property of the state to the official from whom it was received by the bank, or to whom the bank's possession thereof was attributable; the act of so paying or delivering being free from mala fides. But the stated inquiry is not, in our opinion, alone answerable through this method of eliminative deduction. The convict department is in a large sense a commercial enterprise. By Code, § 6515, a wide discretion is committed to its directors in the hiring or employment of convicts subject to its

appropriate control. All of the activities of the board are referable to the government, care, use, and preservation of those suffering the penalties of offended law. A clerical force to serve its manifest purposes is provided by law. By Code, § 6499, the payment of demands in favor of the department is directed to be made to the president of the board of inspectors; and he, with others concerned in service of that department, is now required to be bonded (Gen. Acts 1915, p. 116). By the law's direction the president of the board was the collector of the demands which went to constitute the approximately $143,000 (including the $103,868.92 represented by the check and drafts delivered to this bank on March 8, 1913, in accordance with Oakley's order) of credits on the books of this bank on account of Oakley as president. In effecting collections he was authorized to effect, and which were in this instance indubitably made through the actually paid and anticipated payment of orders for money payable to him as president, no fault could be ascribed to him or to the bank or banks affording agencies for collecting, at his request, such orders (checks or drafts) for money serving, when paid, to discharge the demands of the department against its debtor. Whether the official would assume the risk (if such there in fact was) in accepting such orders for money in his favor, subject to their ultimate honor and satisfaction, was a question for him to determine on his own responsibility as an official, charged as he was in the premises. He could not discharge the demand by accepting anything other than money; but that he might use the ordinary agencies for the transmission of money or for the reduction to money of an order in his favor is not to be doubted in this day of the practically universal employment of banking facilities to effect the prompt discharge of demands, especially of large commercial enterprises of the type to which our convict department may be likened. In the present case the orders for money delivered on March 8, 1913, to appellee were either honored, or the bank, anticipating their honor, advanced the sum that their honor would have produced. This did not, of course, operate to the prejudice of any one. The delivery by this bank of the funds and exchange which the chief clerk embezzled was on the president's order. Section 100 of the Constitution of 1901 is without bearing upon the issue under consideration. As shown, the laws constituted the president of the board of convict inspectors the proper receiptor of funds

devoted to the payment of demands accruing to the state through the operations of the convict department; and payment of demands thereby created to the president of that board was payment to the state, discharging the debtor's obligation to the state through the operation of the convict department. The decision in *Wolffe v. State,* 79 Ala. 201, 58 Am. Rep. 590, only consists with, is not at all opposed to, the conclusions attained here. It was therein held that Wolffe's liability to the state was due to the fact that he, with full knowledge, collaborated with Vincent, the state treasurer, in misapplying the state's money to Vincent's private account; and this legal result followed from the premises thus stated in 79 Ala. on page 207, 58 Am. Rep. 590: "The illegality is found, not in the receipt of the money by Vincent; *he was entitled* to it; not in the purchase of exchange; he had authority to purchase it. It consisted *alone* in the application of the funds of the state, having the earmark of its ownership, to Vincent's individual uses. In this both Vincent and Wolffe participated, actively and knowingly." (Italics supplied.)

(4) Unless it can be affirmed that such delivery could only be made to Oakley himself, it is manifest that this delivery to the chief clerk was a delivery to the president of the board of convict inspectors. The inquiry involves the matter of the delegability vel non of the president's stated power, authority, and duty with respect to the collection of demands and the handling of funds derived from the operations of the convict department. The following response of our Court of Appeals in *Lacy's Case,* 13 Ala. App. 229, 230, 68 South. 106, Judge Brown writing, to the same inquiry, though necessarily differently there related, impresses the court as being presently applicable, manifestly sound, and conclusive to the effect that the president of the board could validly delegate to the chief clerk the authority he exercised in receiving the values in question from the bank:

"It is insisted that the matter of handling the funds of the convict department, in view of the provisions of the statute requiring all accounts to be paid to the president of the board, and requiring him to make quarterly settlement, is a personal trust committed to the president which he must perform in person. The general rule of law is that, when duties of a judicial nature, such as involve the exercise of judgment or discretion, are conferred upon a public officer, the right to perform such duties cannot be delegated to another, in the absence of an express grant of

authority.—Meechem on Public Officers, § 566; 36 Cyc. 859. But mechanical or ministerial duties may be delegated to deputies, clerks, or assistants.—Meechem on Public Officers, § 568; 36 Cyc. 859; Throop on Public Officers, §§ 569, 570. Where the law provides a clerical force to perform the ministerial duties of a department prescribing their duties in general terms, as in the case of the convict department, any duty of a ministerial or mechanical nature such as receiving, accounting, paying into the proper channels, and keeping a record of the funds of the department, in the absence of an express provision prohibiting it, is within the range of the authority of the clerical force.

"The law clearly contemplates that money belonging to the state will be brought into the state treasury through the convict department, and while it requires all moneys due the department to be paid to the president of the board of inspecors, and requires him to make quarterly settlement with the state auditor, it clearly contemplates that a complete record and strict account of all such funds shall be kept by the clerical force in the office of the president, and to that end necessitates counting and handling of cash by that force under the supervision and 'direction' of the president.—Code, §§ 6480, 6485, 6498-6500."

It results from the foregoing considerations that no error prejudicial to the appellant underlies the amount of the judgment here under review. Since the defendant (appellee) should have prevailed in the court below, and since the damages awarded the plaintiff (appellant) are nominal only, the judgment will not be reversed. It is hence affirmed.

Affirmed.

ANDERSON, C. J., and SAYRE and GARDNER, JJ., concur.