In what the trial judge described as "one of the more tragic cases that I've seen in the nine years that I've been on the bench," Michael Holman was convicted of the murder of Wilson Durgin, the first degree kidnapping of Pam Crissot, burglary in the first degree, and the unauthorized use of a motor vehicle. Sentence was twenty years' imprisonment, concurrent in each case.
Holman had been living with his ex-girlfriend, Nancy Miranda, and her roommate, Pam Crissot, for approximately two months while he was looking for a job. Early on the morning of May 14, 1985, Ms. Miranda and Ms. Crissot returned home with two male companions. Ms. Miranda demanded that Holman, who had been sleeping in her bedroom, leave so that she and her companion could use the room.
Later, Ms. Miranda drove the two men to their cars. When she returned, Holman called her a "whore" and they argued. The police were called and Holman was given his belongings, "kicked out" by Ms. Miranda and Ms. Crissot, and told not to return.
Shortly after the police left, Holman telephoned Ms. Miranda and asked if he could come back. Angered at the denial of his request, he returned to the residence where Ms. Miranda and Ms. Crissot remained firm in their refusal to allow him admission to the residence. Holman "ripped" open the screen door and came on the porch. He threw a flower pot through a window and crawled in the house. Holman grabbed Ms. Miranda by the neck and said, "Come on, come here, let's go." She managed to escape his hold and ran out the back door with Holman following. When Ms. Miranda ran to a neighbor's, Holman returned to the residence, got a knife, grabbed Ms. Crissot and said, "Come on, you're going with me. I'm going to take you hostage." Holman made Ms. Crissot get the keys to Ms. Miranda's 1966 Chevrolet Camaro automobile. Driving with one hand on the steering wheel while his other hand held a knife to Ms. Crissot's throat, Holman drove through the streets of Mobile and onto the *Page 117 
interstate highway. He fled the police, ran a police roadblock on the interstate, and crashed into a car stopped some distance behind the roadblock. Wilson Durgin was the driver of this parked automobile. Durgin was thrown from his car and killed.
Holman was taken to the hospital where he was released the next day. Upon his release he was taken to police headquarters where he gave a tape-recorded confession admitting his guilt: "I tried to swerve but it was too late. I hit the cars . . . but I meant . . . I mean anything the judge gives me, I deserve. I meant that cause I murdered somebody and I kidnapped somebody and I'm saying I'm guilty in this tape recorder. I mean, I didn't mean to kill the guy but I couldn't help it. My brakes wasn't working too well. It just slid around and hit the car and I was trying to get away from ya'll [police]."
 I
Holman's confession was properly admitted into evidence. At the suppression hearing, there was no evidence that Holman's mental or physical condition was so impaired that he could not make a knowing, intelligent, and voluntary waiver of hisMiranda rights. The State's evidence was to the effect that he could have made such a waiver. Holman, who did not testify at the suppression hearing, took the stand in his own defense at trial and stated that when he was released from the hospital and interrogated he was "having black-out spells," "was dizzy in the head," "was hurting real bad in [his] ribs and . . . elbow," and that "It was killing" him.
Our review convinces us that, even viewing this argument in the light most favorable to Holman, the evidence of voluntariness was conflicting. Since there is substantial evidence to support the judge's determination of voluntariness, that decision must stand. Williams v. State, 461 So.2d 834, 838
(Ala.Cr.App. 1983), reversed on other grounds, Ex parteWilliams, 461 So.2d 852 (Ala. 1984).
 II
In the written transcript of the confession given to the jury, portions of Holman's statements were underlined. Although we discourage such a practice because of the potential for abuse, we find no error here.
Holman's confession, including the waiver portion, was only six pages long. There was no danger that the jury would be drawn to read or give undue emphasis to only those portions which were underlined. However, had the statement been lengthy, voluminous, conflicting or confusing, we would not be so confident in reaching this conclusion or in our finding of no error.
Before the transcript was admitted into evidence, the jury had heard everything it contained. Additionally, the prosecutor had a right to comment on anything in evidence so that, even had the transcript not been underlined, the prosecutor could have used it, as he did, in cross examining Holman and, in that way, emphasizing certain portions of the transcript.
 III
The evidence is more than sufficient to support Holman's indictment and conviction for reckless murder. Alabama Code 1975, § 13A-6-2 (a)(2). "An accidental death may constitute murder if `[u]nder circumstances manifesting extreme indifference to human life, [the defendant] recklessly engages in conduct which creates a grave risk of death' to the victim and thereby causes the victim's death." Ex parte Weems,463 So.2d 170, 172 (Ala. 1984). Such murders include "those homicides caused by such acts as driving an automobile in a grossly wanton manner." Northington v. State, 413 So.2d 1169,1172 (Ala.Cr.App. 1981), cert. quashed, Ex parte Northington,413 So.2d 1172 (Ala. 1982); Commander v. State, 374 So.2d 910,913-15 (Ala.Cr.App. 1978), cert. quashed, 374 So.2d 921 (Ala. 1979). "The textbook examples of universal malice are generally such acts as shooting into an occupied house or driving an automobile into a crowd." Napier v. State, 357 So.2d 1011, 1014
(Ala. *Page 118 
1978). Under prior Alabama law, this Court held: "In order to authorize a conviction for murder in the second degree for a homicide caused by the driving of an automobile, the evidence must be sufficient to warrant a finding by the jury that the accused either intentionally caused the collision or that he `was conscious of his acts, conscious of the impending danger surrounding him, and of the probable results of his acts, and then with reckless indifference to the probable consequences of his acts, brought about the collision and death of the deceased.' Hyde, 230 Ala. at 244, 160 So. at 238." Commander, 374 So.2d at 914.
There was evidence from which the jury could properly find that Holman engaged in conduct manifesting an extreme indifference to human life. Under the circumstances, the argument that the evidence was insufficient to support a murder conviction because there was no evidence to show that Holman "knew that there was anybody in any of the cars in the roadblock area" (Appellant's brief, p. 11), is without merit. Testimony from various witnesses for the State showed that Holman almost hit several people, ran red lights, drove on the wrong side of the road, and "jumped" the median, "pushed" a car blocking his way into the oncoming lane of traffic, drove in excess of one hundred miles per hour, failed to slow down for a police blockade where he would have hit a police officer with a drawn weapon had not the officer gotten out of the way, failed to stop for a police siren, and attempted to flee the police. Ms. Crissot stated that "we were going faster after they [police] tried to stop us cause it made him [Holman] nervous." Behind the police blockade, all three lanes of the interstate highway were blocked by cars that had been stopped. Holman did not even slow down. Russell Whatley testified: "Well when the car [Holman] passed me it crossed all three lanes of traffic, . . . and I thought it was going to try to avoid the roadblock at first but he made . . . a bootlegger's turn. You see it in the movies when they try to turn around and go in the other direction not slowing down. That looked like that's what he tried to do and the car slid out of the turn and it struck the first car. * * * I thought he was going to try that [going around the three lanes of traffic by going off to the grassy side of the road] but instead he didn't turn far enough. He went straight for the roadblock."
There was no evidence that Holman was under the influence of alcohol or drugs. His awareness of the danger involved and the probable consequences of his actions are demonstrated by the fact that he was driving with his "flashers" on and, at least at one point, was blowing his horn.
Ms. Crissot testified that if, at the police blockade, Mobile Police Sergeant John Wayne Boone "hadn't gotten out of [the road] he'd have been run over." She stated that after Boone fired at the car "we went faster." According to Ms. Crissot, they crashed "seconds" after Sergeant Boone shot. Although she thought Holman "probably tried to avoid it," she did not remember him slowing down or applying the brakes before they crashed.
Even Holman testified that "there was a lot of traffic" but that he was speeding ("doing about seventy, eighty, something like that") and ran "one or two" red lights. When Sergeant Boone shot at him he "heard the shot and knew that somebody was shooting at [him] so he must have been a police officer" and he "mashed the gas pedal more." Holman testified that when he saw the traffic blocking the highway he "mashed" the brakes but they would not work so he tried "to swerve over" and "try to miss `em" and that is when he "swerved and skidded." He testified, "The brakes wouldn't work so I tried to do a bootlegged turn."
Under the evidence the issue of the recklessness of Holman's conduct and the question of his guilt or innocence of murder were properly submitted to the jury.
 IV
"[U]nder the criminal code definition of burglary, the intent to commit a crime may *Page 119 
be concurrent with the unlawful entry or it may be formed after the entry and while the accused remains unlawfully. § 13A-7-7."Gratton v. State, 456 So.2d 865, 872 (Ala.Cr.App. 1984) (emphasis in original). The indictment charged that Holman "did knowingly and unlawfully enter or remain unlawfully in the dwelling of Nancy Miranda, with intent of committing a crime therein, to-wit: kidnapping." The indictment does not charge whom Holman intended to kidnap. The evidence justifies a finding that he broke in with the intent to kidnap Ms. Miranda but actually abducted Ms. Crissot.
Initially, Holman actually broke and entered the residence by breaking the window and crawling through. Once inside, he grabbed Ms. Miranda and said, "Come on, come here, let's go." Under all the circumstances surrounding this event, especially those subsequent developments, this constitutes sufficient evidence that Holman unlawfully entered with the intent to kidnap.
Ms. Miranda escaped and Holman pursued her out of the house. When she sought refuge at a neighbor's, Holman returned, re-entered the house and told Ms. Crissot, "Come on, you're going with me. I'm going to take you hostage." This second entry into the residence also constituted an unlawful entry. "Breaking is not an essential element of burglary as defined in our criminal code." Johnson v. State, 473 So.2d 607, 611
(Ala.Cr.App. 1985). "A person `enters or remains unlawfully' in or upon premises when he is not licensed, invited or privileged to do so." Alabama Code 1975, § 13A-7-1 (4). "A person who is licensed or privileged to enter premises cannot, therefore, commit criminal trespass or burglary." Commentary to § 13A-7-1.
The evidence is undisputed that any license or privilege Holman had to enter Ms. Miranda's residence had been terminated before the initial breaking and entering. Holman testified that, although he considered that residence his home, the house was "basically" Ms. Miranda's. He stated that a police officer brought him his clothes and "said for me to leave and I did." Holman testified that he telephoned Ms. Miranda and asked to be allowed to come back: "I told her that I wanted to come back because I'd gotten me a job and that, . . . to let me stay there for two weeks and I'd get out; I'd promise her. And I told her I wouldn't touch her, to let me come over there."
Under these facts, the evidence is sufficient to sustain Holman's conviction for burglary.
 V
The trial court did not err in refusing the following requested charge: "Ladies and gentlemen of the jury, I charge you that burglary is not committed by one who breaks and enters his own dwelling."
In Stanley v. State, 57 Ala. App. 83, 84, 326 So.2d 148
(1976), this Court held that burglary, as defined by Title 15, § 259, Alabama Code (1940), "is not committed by one who breaks and enters his own dwelling or other building." Here, this proposition was abstract because the uncontradicted evidence shows that Holman had no privilege or license to enter Ms. Miranda's residence. Moreover, the substance of this charge was fairly covered by the trial judge when he instructed the jury, "To enter or remain unlawfully means that a person is on or upon premises where he is not licensed or privileged or invited to be."
 VI
Holman was indicted for first degree theft involving Ms. Miranda's automobile. The trial judge instructed and the jury found Holman guilty of the unauthorized use of a vehicle as a lesser included offense of theft. The unauthorized use of a vehicle is not a lesser included offense of the larceny or theft of a vehicle. Crowder v. State, 476 So.2d 1241, 1243
(Ala.Cr.App. 1985).
An indictment for theft will not support a conviction for unauthorized use because *Page 120 
one offense is not a lesser included offense of the other. Holman was convicted for a crime with which he was not charged and which was not a lesser included offense of the crime charged in the indictment. Although not objected to, such a conviction is a legal nullity. See Campbell v. State,22 Ala. App. 493, 117 So. 396 (1928). Consequently, Holman's conviction for the unauthorized use of a vehicle is reversed. His convictions for murder, kidnapping, and burglary are affirmed.
AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
All Judges concur.