William Louis Baker was charged by indictment with two counts of theft of property in the second degree, in violation of § 13A-8-4, Code of Alabama 1975. The jury found the appellant "guilty as charged in the indictment" on one of the two charged counts. The trial judge thereafter sentenced the appellant to one year and one day and placed him on two years' probation.
 I
The appellant first contends that he was denied a fair trial because, he argues, the jury deliberated before it was instructed to do so.
We disagree with the appellant. At the close of the State's case-in-chief, the appellant moved for a mistrial, arguing that the jury had already made up its mind about the case. In support of his motion, the appellant called two witnesses who claimed that they had overheard members of the jury discussing the case during a prior recess. The trial judge then called several of the jurors to the courtroom and confronted them with these accusations. The jurors disclosed that some of them had been speculating about how long it would take to finish the trial. Also, one of the jurors joked that the attorneys were going to wear out the textbooks (allegedly stolen by this appellant) by opening and closing them so much. All of the jurors questioned indicated that they could keep an open mind and hear all of the evidence before reaching a conclusion. Based on these responses, the trial judge denied the appellant's motion.
In determining whether the trial judge erred by refusing to grant a mistrial, we must determine whether the alleged juror misconduct "unlawfully influenced the verdict rendered."Reed v. State, 547 So.2d 596, 597 (Ala. 1989), and cases cited therein. If the trial court, upon investigating the misconduct, finds no prejudice, then we will not reverse if its finding is in accord with "competent evidence." Reed.
The appellant cites this court to Ex parte Lasley,505 So.2d 1263 (Ala. 1987), in support of his contention. InLasley, 505 So.2d at 1264, the Alabama Supreme Court quoted from Roan v. State, 225 Ala. 428, 435,143 So. 454, 460 (1932), as follows:
 "The test of vitiating influence is not that it did influence a member of the jury to act without the evidence, but that it might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced its verdict rendered."
(Emphasis added in Lasley.)
Even under the lighter burden of Lasley andRoan, the appellant has failed in his proof. As we stated previously, all of the questioned jurors indicated that they could keep an open mind until they heard all of theevidence. While, admittedly, the appellant has a "light burden" in proving juror prejudice, Lasley, citingEx parte Troha, 462 So.2d 953 (Ala. 1984), we find no evidence which indicates that the jurors were *Page 1020 
predisposed to a finding other than as they indicated to the trial judge.
Therefore, the appellant is not entitled to a reversal on this issue.
 II
The appellant next contends that his second statement to the police should have been suppressed because, he says, it was not given voluntarily.
On November 25, 1987, Lieutenant Larry Montgomery with the University of Alabama Police Department picked up the appellant at his place of employment, the University Supply Store at Ferguson Center. Lieutenant Montgomery and the appellant drove from the supply store in an unmarked police car to the police department. Upon arriving at the police department, Lieutenant Montgomery explained to the appellant why he was there and read him his Miranda rights. Lieutenant Montgomery then had the appellant read those rights from a waiver of rights form and had the appellant sign the form to indicate that he understood those rights.
Lieutenant Montgomery testified that the appellant seemed a little nervous but otherwise acted normal. He stated that he and the appellant talked about the three textbooks that the appellant allegedly sold to the University Supply Store at Tutwiler Center. He said that after talking for a few minutes, the appellant wrote out a statement. Without objection by the appellant, Lieutenant Montgomery read this statement in court. In short, the appellant wrote that he bought the books at the beginning of the school semester and sold them back when he did because he needed some money to buy the materials for a research assignment. (R. 171-72, 237-38.)
Exactly what happened after the appellant gave this statement was disputed by Lieutenant Montgomery and the appellant. The appellant objected to testimony regarding any further discussions had between Lieutenant Montgomery and the appellant and also moved to suppress the written statement which followed. Based on his objection, the trial judge held a hearing outside the presence of the jury.
Lieutenant Montgomery claimed that following the appellant's first statement, he asked the appellant if he understood the coding system used by the supply store on its pricing decals. The appellant allegedly responded that he did not, so Lieutenant Montgomery explained to him that the books were dated and priced one to three days before he sold them back to the supply store.[1] Lieutenant Montgomery testified that the appellant became slightly more nervous and, after discussing the matter with Lieutenant Montgomery, agreed to write out a second statement.
In this latter statement, the appellant indicated that, while at work at the supply store, he noticed four books on the book drop inside the store. When he got off from work, he said he went to do some research, but returned to the store a short time later and found the books still there. He wrote that he took the four books and exited the store; that he gave one of the books to a friend, Pedro Frezberry, and sold the other three books to the supply store on the following day; that he did not think that the books were stolen and that had he known that they were stolen he would have returned them. After writing the statement, he signed it and dated it at the bottom.
The appellant also testified at the hearing. He claimed that, following his first statement, Lieutenant Montgomery became "outrageous" and started slamming books on the table. According to the appellant, he was told that he was lying, that they knew that he stole the books, and that if he did not confess, then life at the University would be made difficult for him. The appellant testified further that he was on academic probation, that he knew his future was at stake, and that he knew about Lieutenant Montgomery's past dealings with some of his fraternity brothers. According *Page 1021 
to the appellant, Lieutenant Montgomery had been known to harass students to the point of removing them from their classrooms. The appellant admitted that he made the second statement but claimed that he told Lieutenant Montgomery what he wanted to hear because he thought that Montgomery would then leave him alone. (R. 212-13.)
Lieutenant Montgomery then testified again. He stated that he had been unaware of the appellant's academic situation at the time of the statement. He also stated that he made no promises or threats, and offered no inducements to get the appellant to confess.
Based on this evidence, the trial judge denied the appellant's motion to suppress. Both statements were thereafter read to the jury and were admitted into evidence.
Addressing the voluntariness of a confession, this court stated in Tice v. State, 386 So.2d 1180, 1185
(Ala.Cr.App.), cert. denied, 386 So.2d 1187 (Ala. 1980):
 "The voluntariness of an alleged confession is a question of law addressed to the trial court whose ruling, upon preliminary proof, will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Garrison v. State, Ala.Cr.App., 372 So.2d 55 (1979)."
In this case, the court could find that the appellant knowingly and intelligently waived his Miranda rights. Lieutenant Montgomery, as noted above, testified that he did not use any improper inducement to entice the appellant to confess. Based on this evidence, the trial judge's finding was not error. See Holman v. State, 495 So.2d 115, 117
(Ala.Cr.App. 1986); Bills v. State, 49 Ala. App. 726,275 So.2d 706 (1973). The discrepancies in the testimony, under the facts of this case, go to the weight to be afforded the statement by the jury, not its admissibility.
The appellant is thus not entitled to a reversal on this claim.
 III
Last, the appellant contends that the State failed to sufficiently prove that he committed theft, second degree, and that his conviction is thus due to be reversed. The appellant's argument in support of this contention is three-fold: (1) that the State failed to prove asportation; (2) that the State failed to prove that the four textbooks were the "property of the Board of Trustees of the University of Alabama," as alleged in the indictment; and (3) that his confession was based on an illegally obtained confession.
First of all, we held that the appellant's confession was voluntarily, intelligently, and knowingly given, in part II of this opinion. To the extent that the jury's verdict was based on his confession, we find no grounds for reversal. Thus, the appellant's third argument must fail.
If the appellant's conviction is going to stand, however, it must do so on the basis of § 13A-8-4(e), Code of Alabama 1975. That subsection states: "The theft of property which exceeds $25.00 in value, and which is taken from or in a building where said property is sold or stored, constitutes theft of property in the second degree."
The State proved that the textbooks were valued at more than $25 and were taken from a building (i.e., the supply store). The appellant claims, though, that the State failed to prove asportation. We have previously held that the slightest taking and carrying away will satisfy the requirement of asportation.Fitts v. State, 482 So.2d 1347, 1349 (Ala.Cr.App. 1985), and cases cited therein. The appellant confessed to taking the books from the book drop area inside of the supply store at Ferguson Center. This more than satisfies the necessary showing required to prove asportation.
The appellant also argues that the State failed to prove that the textbooks were the property of the University of Alabama. Section 13A-8-2, Code of Alabama 1975, reads as follows: "A person commits the crime of theft of property if he: (1) knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive theowner of his property. . . ." (Emphasis added.) Section13A-8-1 *Page 1022 
defines "owner" as follows: "(8) OWNER. A person, other than the defendant, who has possession of or any other interestin the property involved, even though that interest or possession is unlawful, and without whose consent the defendant has no authority to exert control over the property." (Emphasis added.)
The testimony at trial established that the coded decals on the four textbooks were placed on the books by personnel of the supply store at Ferguson Center. The decals, according to the dates thereon, were placed on the books one to three days before they were repurchased from this appellant (three books) and Pedro Frezberry (one book).
There was no record to indicate that the appellant bought these books the day before he sold them back to the supply store. The employees of the supply store who testified at trial indicated that they did not see the appellant leave the store with the books. Likewise, it was established that the appellant was not given permission to take the books from the store.
The inference that the textbooks might have belonged to someone other than the supply store came from the appellant's confession, where he stated that he took the books from the book drop area. The book drop is apparently a collection of storage bins where students can place their personal belonging and books while they are shopping in the store.
Robert Palmer, a manager of the supply store, testified that students commonly leave their belongings in the book drop area. He testified that the store typically will leave the items there for a few days to allow students the opportunity to realize where they left them and to retrieve them. If the items, including lost books, are not retrieved within a short time, they are placed in the store's receiving area for people to reclaim in the future. He stated that the books could revert back to school property, but he was not aware of that ever happening.
Alabama's definition of "owner" is somewhat lax, in that all that is required is that the person from whom the property is taken have "possession of or any other interest in the property involved." Assuming arguendo that the jury based its decision, in part, on the finding that the appellant took the books from the book drop area, we would not be obliged to overturn his conviction.
As this court stated in Hubbard v. State,471 So.2d 497, 500 (Ala.Cr.App. 1984), cert. quashed (Ala. 1985):
 "As Judge Clark, writing for this Court in Hubbard v. State, 374 So.2d 427
(Ala.Cr.App. 1979), observed, 'Similar questions of variances between the indictment and the proof have been a source of concern for hundreds of years and have not abated. The principle is clear to the effect that it is not absolutely necessary that the evidence show that title to the property is in the person or legal entity designated in the indictment, but that if the evidence shows that if the individual or legal entity designated in the indictment has a special property right to the property, it is sufficient.' 374 So.2d at 430. See also Riggens v. State, 44 Ala. App. 275, 276, 207 So.2d 141, 142 (1968); Lacey v. State, 13 Ala. App. 212, 68 So. 706, 711
(1915). '[T]o constitute a good indictment for larceny the thing stolen may be charged to be the property of the actual owner or of a person having a special property, as bailee, and from whose possession it was stolen.' Joyce on Indictments § 427 at 487-88 (2nd ed. 1924)."
We stated in like fashion in Cogburn v. State,473 So.2d 625, 626 (Ala.Cr.App. 1985):
 " 'In a larceny prosecution the ownership of the alleged stolen property is properly laid in the person who is in the right possession
thereof at the time of the theft.' Gandy v. State, 35 Ala. App. 299, 46 So.2d 247 (1950). It therefore follows that the same logic applies in present day 'theft of property' cases."
(Emphasis added.) See also Coker v. State,396 So.2d 1094, 1096 (Ala.Cr.App. 1981).
Therefore, even if the books were taken from the book drop area after being misplaced by a student, they still were in the *Page 1023 
"rightful possession" of the supply store. While the supply store might not have technically become a bailee, it still assumes some authority over the belongings of others which are left in the book drop area because its employees are instructed to collect any items that remain there after a few days. For the purposes of the theft statute, the requirement of ownership in the University of Alabama was sufficiently satisfied.
The evidence, when viewed as a whole, clearly establishes that this appellant took four textbooks from the supply store which were valued at over $25 and which were the property of another person.
Therefore, for the reasons stated in this opinion, the judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
All the Judges concur; BOWEN, J., in result only.
[1] The University Supply Store had a buy-back policy, whereby it would pay 60% of the purchase price of a book if that book was going to be used by a professor in the upcoming semester.